**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **ROBERT M. CRANE, JR.,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No. 5:15-cv-00345-CAR-CHW** |
| | : | |
| **Deputy Warden KARL FORT,** *et al.*, | : | |
| | : | **Proceedings Under 42 U.S.C. § 1983** |
| **Defendants.** | : | **Before the U.S. Magistrate Judge** |

## REPORT & RECOMMENDATION

Plaintiff Robert M. Crane, Jr., an inmate at Washington State Prison ("WSP"), filed a *pro se* civil rights complaint under 42 U.S.C. § 1983 on September 8, 2015. Doc. 1. Plaintiff alleges that on November 19, 2013, Defendants Fort, James, and Stewart used excessive force when they fired pepper-balls and Oleoresin Capsicum ("O-C") spray on Plaintiff after he failed to "cuff up." Doc. 1. Plaintiff further asserts that Defendants Grier, Oliphant, Askew, Gibbons, Danford, Conner, and Lockhart failed to intervene to stop the excessive use of force. Doc. 1. As a result of the use of force, Plaintiff incurred several medical injuries, including damage to his eyes, to which he alleges Defendant Fort was deliberately indifferent to. Doc. 1.

Plaintiff also alleges that Defendant Fort subjected him to cruel and unusual punishment by withholding food and water and placing him in a cell without heat during the winter months (Doc. 1) and that Defendant Fort retaliated against him by withholding food, water, and heat and by "validating" him as a gang member. Doc. 1; Doc. 37.

Defendants filed a Motion for Summary Judgment on all of Plaintiff's claims on May 20, 2016. Doc. 33. Plaintiff filed a "Motion to Dismiss Defendants' Motion for Summary Judgment" (Doc. 37), which the Court construes to be Plaintiff's response to Defendants'

summary judgment motion. In his response, Plaintiff concedes that his claim against Defendant Stewart should be dropped, as it was mistakenly made. Doc. 37, p. 9.

Because there remain genuine issues of material fact and because Defendants are not entitled to judgment as a matter of law, it is **RECOMMENDED** that Defendants' Motion for Summary Judgment be **DENIED** regarding Plaintiff's claims against Defendant Fort for excessive force, deprivation of food, and retaliation by deprivation of food.

It is further **RECOMMENDED** that summary judgment be **GRANTED** as to all other claims, including claims against Defendants Grier, Oliphant, Askew, Gibbons, Danford, Conner, and Lockhart for failure to intervene, and claims against Defendant Fort for deliberate indifference to serious medical needs, deprivation of water and heat, and retaliation by deprivation of water and heat.

## SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. However, there must exist a conflict in substantial evidence to pose a jury question. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), and *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law. *See Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to

any material fact and the movant is entitled to judgment as a matter of law." *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. *See id.* (citing *Celotex v. Catrett*, 477 U.S. 317, 322–23 (1986)). In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. *Peek–A–Boo Lounge of Bradenton, Inc. v. Manatee Co., Fla.*, 630 F.3d 1346, 1353 (11th Cir. 2011). However, "unsworn statements, even from pro se parties, should not be 'consider[ed] in determining the propriety of summary judgment.'" *McCaskill v. Ray,* 279 F. App'x 913, 915 (11th Cir. 2008) (quoting *Gordon v. Watson*, 622 F.2d 120, 123 (5th Cir. 1980)).

Defendants filed a response to Plaintiff's Motion to Dismiss, arguing their Statement of Facts must be admitted due to Plaintiff's failure to follow Local Rule 56. Doc. 43. Defendants also argue Plaintiff's claims were not supported by the record and that Plaintiff had abandoned his claims. *Id.* Although Plaintiff was not in full compliance of Local Rule 56, Plaintiff did submit some evidence in his response. Even if Plaintiff had wholly failed to respond to the motion for summary judgment, the Court "cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion. *United States v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004). In considering the merits of a motion for summary judgment, even an unopposed motion, a court must, at least, "review all of the evidentiary materials submitted in support of the motion for summary judgment." *Id.* at 1101-02. In other words, the

court cannot simply accept the facts stated in a moving party's statement of material facts as true, but must also review the movant's citations to the record and confirm that there are no issues of material fact. Id. at 1103 n. 6. Pursuant to Rule 56(c), the court "need consider only the cited materials, but it may also consider other materials in the record." In light of Plaintiff's *pro se* status, the Court will consider the content of Plaintiff's response to Defendants' Motion for Summary Judgment and all evidentiary materials on file. *See Keith v. Stewart,* No. CIVA 3:05CV0027 JTC, 2006 WL 2298004, at *5 (N.D. Ga. Aug. 8, 2006).

## FACTS

In support of his Complaint, Plaintiff relies on his pleadings, video evidence, deposition testimony, the affidavits of Defendants, his grievances, and other exhibits. In support of their Motion to Dismiss, Defendants rely on their affidavits, the video evidence, Georgia Department of Corrections Standard Operating Procedures, Plaintiff's medical records, and other exhibits. On Defendants' Motion for Summary Judgment, the Court must construe the evidence and draw all inferences in the light most favorable to Plaintiff. *Anderson v. Liberty Lobb, Inc*. 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.") (citing *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 158 – 59 (1970)).

Use of Force Claim

It is undisputed that on November 19, 2013, Plaintiff was placed in a recreational-yard cage outside of the J-2 segregation unit as Defendants were preparing to move Plaintiff to his cell. Defendant Fort has testified by affidavit that he ordered Plaintiff transferred to the J-dorm segregation unit in response to concerns that Plaintiff was participating in gang-related activity. Doc. 33-3, p. 4. While in the cage, Plaintiff alleged that he was being placed in the segregation unit "for no reason," and asked to speak with Warden Donald. Doc. 1, p. 4. When it was time for

Plaintiff to be moved to his cell, Plaintiff was instructed to cuff up, following the usual procedure for transferring prisoners from a recreational cage to a cell. *Id.*; Doc. 33, Exh. 4 at 54. Plaintiff refused to comply. Doc. 1, p. 4. Defendant Fort, the Deputy Warden of Security, went to the recreational cage to talk with Plaintiff, but Plaintiff again insisted that he wanted to speak with the Warden. *Id.*

After Plaintiff refused to comply, the prison officials assembled an extraction team to remove Plaintiff from the recreational cage. *Id.* The team consisted of Defendants Captain Lela Grier, Lt. Gail Oliphant, Lt. John Askew, Lt. Edginal Gibbons, CERT Sgt. Celend James, CERT Officer Danford, CERT Officer Stewart, CERT Officer Connor, and CERT Officer Lockhart. *Id.* The officers wore protective riot gear, and activated two video cameras to document the event. *Id.*; Doc. 33-2, p. 2. The officers also carried two pepper-ball guns and cans of O-C spray. Doc. 1, p. 4.

Defendant James entered the empty cell next to Plaintiff and gave him one last order to cuff up. Doc. 1, p. 5; Doc. 33, Exh. 6 at 01:40. Again, Plaintiff refused to cuff up, and Defendant James deployed O-C spray in Plaintiff's direction. Doc. 1, p. 5; Doc. 33, Exh. 6 at 01:43. After being sprayed with the chemical, Officer Ruff began to fire pepper-balls at Plaintiff. Doc.1, p. 5; Doc. 33, Exh. 6 at 01:48. Overwhelmed by the spray, Officer Ruff dropped his pepper-ball gun and left the scene. Doc. 1, p. 5; Doc. 33, Exh. 6 at 02:10.

Plaintiff covered his face and coughed during this initial phase of the extraction. Doc. 33, Exh. 6 at 2:14. Soon afterward, however, Plaintiff began to pace back and forth and yell, "fuck that . . . fuck that . . . I'm thugged out! . . . Let's rock! . . . Let's rock!" Doc. 33, Exh. 6 at 02:14. Plaintiff then took off his shirt, while inmates from inside the dorm yelled, cheered, and banged on things as they watched the event.  Doc. 33, Exh. 6 at 02:33. As Plaintiff began to pace and

yell, O-C spray and pepper-balls were once again deployed. Doc. 33, Exh. 6 at 02:31.

Defendant Fort picked up Officer Ruff's pepper-ball gun and approached the recreational cage. Doc. 33, Exh. 6 at 02:42. Once at the cage, Defendant Fort began shooting Plaintiff with the pepper-ball gun. Doc. 33, Exh. 6 at 02:51. Upon seeing Defendant Fort at the fence, Plaintiff approached and yelled, "There you go! I'ma come up! I'ma come up!" Doc. 33, Exh. 6 at 02:52. As Plaintiff approached Defendant Fort, with his hands covering his face, Defendant Fort began rapidly shooting Plaintiff with the pepper-ball gun. Doc. 33, Exh. 6 at 02:52. It appears that most of these pepper-balls hit Plaintiff in the stomach and chest. Doc. 33, Exh. 6 at 02:58.

After the rapid fire, Plaintiff let out a groan and walked backwards, away from Defendant Fort. Doc. 33, Exh. 6 at 02:58. Once Plaintiff was approximately twelve to eighteen feet away, Defendant Fort paused from shooting Plaintiff.  Doc. 33, Exh. 6 at 03:01. Plaintiff dropped his hands from his face and exclaimed, "I'm thugged out!" Doc. 33, Exh. 6 at 03:01. In the audio from the recording, Plaintiff can be heard calling someone a "coward," followed by the resumption of pepper-ball shots being fired at Plaintiff.  Doc. 33, Exh. 6 at 03:03. Several of these pepper-ball shots hit Plaintiff high in the body, some hitting his eyes and head. Doc. 1, p. 6; Doc. 33, Exh. 6 at 03:05.

Plaintiff immediately began to hold his face and shout, "My eye . . . oh shit."  Doc. 33, Exh. 6 at 03:10. Still holding his face, Plaintiff began to walk towards the front of the recreational cage, "thinking that Fort would stop shooting the pepper-ball gun at me." Doc. 1, p. 6. The entire time Plaintiff walked to the front of the recreational cage, Defendant Fort continued to shoot him with the pepper-ball gun. Doc. 33, Exh. 6 at 03:11. Defendant Fort did momentarily pause from shooting Plaintiff once Plaintiff reached the front of the recreational cage, then fired two more shots at Plaintiff. Doc. 1, p. 6; Doc. 33, Exh. 6 at 03:16. It is unclear what Plaintiff did

during the momentary pause just prior to the two final shots, but the video does illustrate that these shots were at a close range. Doc. 33, Exh. 6 at 03:17. Plaintiff then submitted to being cuffed, and the CERT officers entered the recreational cage and apprehended Plaintiff. Overall, the video shows that almost fifty (50) pepper-balls were fired during the incident.

Plaintiff's Medical Care

After Plaintiff was restrained by the CERT team, he was immediately taken to the showers for decontamination and to the medical unit for an examination. Doc. 1, p. 6;  Doc. 33, Exh. 6 at 04:54 and 5:48. During this shower, officers used water to wash the chemicals off his face.  Doc. 33, Exh. 6 at 06:21. Plaintiff was then taken to the medical unit, where the nurse noted "multiple lacerations to abdomen, arms, lower back, head, Rt eye swollen shut, purple." Doc. 33, Exh. 6 at 07:01; Doc 33-12, p. 4. Dr. Rogers, the prison doctor, ordered that Plaintiff be sent to Oconee Regional Medical Center for evaluation. *Id.*

Plaintiff was transported to Oconee Regional Medical Center by Defendants Danford and Stewart, approximately twenty five minutes after the incident. Doc. 1, p. 7; Doc. 33, Exh. 6 at 31:00. Plaintiff received a CT scan of his facial bones and head and an x-ray of his lower back, all of which were negative for any fractures. Doc. 33-12, p. 21. Plaintiff was diagnosed with a soft tissue contusion, skin abrasions, and an eye contusion. *Id.* at 18-20. For the eye contusion, Plaintiff was instructed to ice his eye several times a day and to "[f]ollow up with an Ophtha[l]mologist tomorrow." *Id.* at 20-21. Plaintiff returned to WSP and was placed in his J-2 segregation unit. Doc. 1, p. 7.

The next day, November 20, 2013, Plaintiff was seen by Dr. Rogers at the WSP medical unit. *Id.* Plaintiff alleges that he overheard Defendant Grier tell Dr. Rogers that "[Defendant] Fort did not want Plaintiff sent out of the prison for no reason until further notice from

7

[Defendant Fort]." *Id.* Dr. Rogers examined Plaintiff and noted that Plaintiff did not appear to be in severe distress. Doc. 33-12, p. 25. Dr. Rogers spoke by phone with an ophthalmologist at the Dublin Eye Clinic, for suggestions on how to treat Plaintiff. *Id.* The ophthalmologist recommended a topical treatment, and Dr. Rogers ordered E-Mycin and artificial tears be used on Plaintiff's right eye. *Id.* Plaintiff alleges Dr. Rogers told him if the eye drops did not work in two weeks that Plaintiff could fill out a sick call request. Doc. 1, p. 8.

Dr. Rogers examined Plaintiff again on November 26, 2013. Doc. 33-12, p. 26. Dr. Rogers noted that Plaintiff's injuries had greatly improved and that the swelling and redness had decreased. *Id.* Plaintiff had a normal heart rate and respiratory rate and his blood pressure was slightly above normal. *Id.* Plaintiff still had superficial abrasions around his right eye, but Dr. Rogers told Plaintiff his vision would recover and that he did not need to see an ophthalmologist. *Id.* Even with this information, Plaintiff sought a medical appointment outside of the prison. *Id.*

On December 3, 2013, Plaintiff was seen by a nurse at WSP. Doc. 33-12, p. 27. Plaintiff complained of back pain and blurry vision out of his eye. *Id.* The nurse noted that Plaintiff was healthy with normal vital signs, and that his weight was two hundred and sixty-five (265) pounds. *Id.* On December 13, 2013, Dr. Henderson of the WSP medical unit examined Plaintiff regarding complaints of blurred vision. *Id.* Dr. Henderson noted that Plaintiff's vital signs were normal, but also noted that Plaintiff had lost sixteen (16) pounds since his December 3 examination. *Id.* Although Dr. Henderson gave no opinion as to why Plaintiff lost weight so drastically, his medical notes include a note that states, "I don't eat in the hole." *Id.*

Dr. Henderson ordered an ophthalmologist appointment for Plaintiff on December 16, 2013. Doc. 33-12, p. 29. Dr. Rogers states in his affidavit that Plaintiff was taken to the Dublin Eye Clinic on December 16, 2013, but was not seen because the doctor was on vacation. Doc.

33-13, p. 5. Plaintiff testified that he was not taken to the Dublin Eye Clinic on December 16, but only went there one time, in February 2014. Doc. 33-7, p. 7. The December 16 appointment was rescheduled to December 23, 2013, but Plaintiff was unable to attend after he was placed on security lockdown. *Id.* Plaintiff's Progress Record illustrates that Plaintiff requested a consultation from Dublin Eye Clinic on January 15, 2014, but remained on security lockdown. Doc. 33-12, p. 30. Dr. Rogers states in his affidavit that he "did not feel [Plaintiff] was in urgent need of seeing the ophthalmologist during the time he was placed on lockdown." Doc. 33-13, p. 5. Dr. Rogers also denies that Defendant Fort ever gave him an order not to treat Plaintiff or allow Plaintiff to see an ophthalmologist, and notes that "security staff never interferes with our medical treatment." *Id.*

Plaintiff was seen by Dr. Rogers again on January 27, 2014. *Id.* at 31. Plaintiff complained of blurred vision, constant headaches, and bleeding from both ears. *Id.* at 30. Dr. Rogers' medical notes state that Plaintiff did not appear to be in severe distress and that his pupils were reactive. *Id.* Dr. Rogers found no evidence of bleeding in Plaintiff's ears, and concluded that Plaintiff's complaints were inconsistent with the exam results. Dr. Rogers referred him to an ophthalmologist for a second opinion due to Plaintiff's "repetitive requests and the inconsistency of my findings with his complaints . . . ." Doc. 33-13, p. 6.

Kathryn Falk, O.D., of Dublin Eye Clinic examined Plaintiff on February 3, 2014. Doc. 33-12, pp. 33-34. On examining Plaintiff's right eye, Dr. Falk observed no serious detachment of the retina or macular hole, but noted an abnormal fovea pit, a vitreoretinal tuft, "difficult view peripherally due to resolving hemorrhage," and "scarring superior temporally." *Id.* Her concluding impression was unspecified macular degeneration in the right eye, "very symptomatic, stable; due to trauma, possibly previous commotio retinae of the fovea," along

with a vitreous hemorrhage. *Id.* at 34. Dr. Falk recommended that Plaintiff wear glasses full time and have a yearly eye exam to monitor the possible development of glaucoma. *Id.*

Dr. Falk referred Plaintiff to a retina specialist at the Dublin Eye Clinic, "regarding vitreoretinal traction inferior/temporal to rule out need for APK laser." Doc. 33-12, p. 34. The retina specialist noted "loss of inner/outer segment junctions on the OCT in the right eye with a broadening and widening of the foveal pit all consistent with atrophy probably secondary to commotion retina." *Id.* at 35. Examination of the right eye revealed significant hemorrhage, making it "very difficult to see through the streaks of blood," but no sign of a hole or tear. *Id.* The specialist recommended a follow-up exam in a month "to check on the hemorrhage and possibility of a detachment." *Id.*

Plaintiff was seen two more times by Dr. Rogers at the WSP medical unit. *Id.* at 37. On February 5, 2014, Plaintiff had an ophthalmological follow-up. *Id.* Plaintiff saw Dr. Rogers again on November 7, 2014, complaining he had a headache and his left ear was hurting. *Id.* Shortly afterwards, Plaintiff was transferred to Johnson State Prison. At his deposition on March 29, 2016, Plaintiff testified that the vision in his right eye remains impaired. Doc. 33-7, pp. 72-73.

Plaintiff's Gang Classification

The evidence in the record shows that Plaintiff had an extensive history of gang-related activity during his term of incarceration. A "Security Threat Group" (STG) change form shows that on October 17, 2013, while at WSP, Plaintiff was observed to be yelling and talking specifically with known members of the gang Good Fellas (GF) as he entered a J-2 unit. Doc. 37-10, p. 2.  On November 8, 2013, Plaintiff was again observed to only be communicating with known GF members as he was transferred to a cell unit. *Id.* It was reported that during this November incident, a known GF member advised Plaintiff to "keep quiet" until Defendant James

left the cell unit. *Id.* On November 20, 2013, a day after the alleged excessive force incident occurred, a CERT team confiscated a state shirt from Plaintiff's cell unit with the numbers "76" on it. Doc. 37-10, p. 2. The number "76" is a term known to be associated with GF members. *Id.*

Defendant Fort states in his affidavit that on November 14, 2013, he received an anonymous letter from an inmate at WSP concerning a gang problem. Doc. 33-3, p. 3. The letter warned of the potential harm in having Plaintiff back in dorm H-1 due to the "feud between the 'Bloods' and the 'G.F.s.'" *Id.* at p. 8. The letter questioned why Plaintiff was released from segregation when all of the other GF members were still on lock down. *Id.* The letter also requested Defendant Fort's help in preventing a situation from arising between the Bloods and the GF. *Id.*

After receiving the anonymous letter, Defendant Fort reviewed Plaintiff's STG file. Doc. 33-3, p. 3. The file showed that Plaintiff was first validated as a member of the Black Panthers on September 1, 2009, while at Georgia State Prison. *Id.*; Doc. 33-3, p. 11. Case notes from Macon State Prison, dated March 6, 2012, on intake following a transfer from GSP, indicate that Plaintiff admitted to being a "shot caller" with the GF gang and boasted that "with just one word he could turn this facility out." Doc. 33-3, p. 12. Plaintiff was transferred shortly afterward to Baldwin State Prison, where he was validated as a member of Young Mafia Family, an offshoot of the Good Fellas gang, on April 18, 2012. Doc. 1, p. 9; Doc. 33-3, p. 13.

More than a year later, on January 30, 2015, the Georgia Department of Corrections Office of Investigation and Compliance, Inmate Affairs Unit, opened an investigation of Plaintiff's STG determination. Doc. 37-11, p. 2. The unit reviewed Plaintiff's grievance and determined on February 11, 2015, that Plaintiff was "not affiliated with the Good Fella Gang." *Id.* The unit did determine that, due to his extensive disciplinary history and past assaults,

Plaintiff remained a Security Threat Individual (STI). *Id.*

Plaintiff's Unit Conditions and Grievances

Upon returning from the hospital on November 19, 2013, Plaintiff was placed in a J-2 segregation unit, cell number 129. Doc. 1, p. 7; Doc. 37-8, p. 2. Plaintiff alleges this cell lacked drinking water and had a window that would not close, causing the cell to be cold. Doc. 1, p. 7. Plaintiff testified at his deposition that he had no clothing except a pair of boxer shorts and blanket. Doc. 33-7, pp. 84-85. On November 20, 2013, Plaintiff allegedly informed Defendant Grier "his cell (129) did not have drinking water, it was cold because the window will not shut, he had not had anything to eat[,] and he did not have any of his personal property." *Id.* at 8. Allegedly, Defendant Grier responded that Defendant Fort had instructed all personnel "not to give Plaintiff anything." *Id.* That same day, Plaintiff informed Defendant Fort of the issues he was having. *Id.* Plaintiff also stated that an officer would not provide Plaintiff with a grievance form. *Id.* Allegedly, Defendant Fort responded to Plaintiff that "you can handle it" and "tough guys don't file grievances chief." *Id.*

Plaintiff filed his first grievance on November 21, 2013. Doc. 37-7, p. 5. This grievance was labeled an emergency grievance and predominantly covered the details of the November 19, 2013 incident. *Id.* The grievance also included Plaintiff's allegation that Defendant Fort was not feeding Plaintiff or giving him water. *Id.* The grievance stated that Plaintiff wanted to press charges on Defendant Fort and that Plaintiff wanted his family to know he was not being fed and had no water in his cell. *Id.* at 6. Plaintiff also requested to see internal affairs because Defendant Fort was not feeding him, in violation of his due process rights. *Id.*

On November 26, 2013, Plaintiff filed a second grievance, grievance number 162932. *Id.* at 3. In this grievance, Plaintiff restated the facts of the November 19, 2013, incident. *Id.* Plaintiff

also included the allegation that Defendant Fort had called Plaintiff a GF member numerous times "without evidence or justification." *Id.* Plaintiff again alleged that his cell unit, J-2-129, was without running water, and requested Defendant Fort be terminated immediately and permanently. *Id.* This grievance was denied on December 27, 2013, for failure to provide proof of Plaintiff's allegations. *Id.* at 4. The denial found that the actions taken by the CERT team in the recreational cage were appropriate to get Plaintiff to comply with the officials' instructions. *Id.* The grievance denial did not make any mention of Plaintiff's allegation of not being fed or given water. *Id.*

Plaintiff has provided as evidence a segregation checklist door chart ("door chart") from the week of November 24, 2013, through November 30, 2013. Doc. 37-8, p. 2. The door chart shows that Plaintiff was provided with three meals a day on weekdays, and breakfast and dinner on the weekends. *Id.* During the week of November 24, Plaintiff was allowed to shower on Monday, Wednesday, and Friday but was not allowed any exercise time. *Id.* Defendants have provided door charts for the entire period from November 19 through January 4. Doc. 33-5, pp. 7-13. The charts show that Plaintiff continued to receive three meals a day on weekdays and two meals a day on weekends. *Id.*

On November 26, 2013, Officer Charles ordered Plaintiff to "pack up and move to room 115." Doc. 37-9, p. 9. Plaintiff refused to move, and a disciplinary report was ordered against him. *Id.* Plaintiff alleges that the disciplinary report was false and was entered in retaliation for the grievance Plaintiff filed the day before. Doc. 37, p. 7. Additionally, Plaintiff contends that the disciplinary report was false because the door chart shows Plaintiff could only be moved by CERT escort, not by one officer instructing Plaintiff to move cells. *Id.*

## DISCUSSION

**A.      Excessive Force Claim**

Excessive force claims brought pursuant to 28 U.S.C. § 1983 are not governed by a single standard. Instead the analysis begins by "identify[ing] the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Conner*, 490 U.S. 386, 394 (1989) (citing *Baker v. McCollan*, 443 U.S. 137, 140 (1979)). Usually, the analysis will focus on Fourth Amendment proscriptions against unreasonable seizures or the Eighth Amendment's proscription against cruel and unusual punishment. *Id.* Claims of excessive force in the context of those incarcerated following conviction are analyzed under Eighth Amendment standards. *Whitley v. Albers*, 475 U.S. 312, 318-25 (1986).

Eighth Amendment excessive force claims have both an objective and subjective component, and Plaintiff has the burden of establishing both. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). To satisfy the subjective prong, Plaintiff must demonstrate that the Defendant acted with a malicious and sadistic purpose to inflict harm. *Id.* To satisfy the objective prong, the plaintiff must show that "the alleged wrongdoing [was] 'objectively harmful' enough to establish a constitutional violation." *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 303 (1991)). However, the key inquiry for excessive force claims arising out of the Eighth Amendment is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 36 (2010) (quoting *Hudson*, 503 U.S. at 7). When the use of force is malicious or sadistic, "contemporary standards of decency always are violated . . . whether or not significant injury is evident." *Id.* (quoting *Hudson*, 503 U.S. at 9).

The Eleventh Circuit recognizes a variety of factors when determining the legitimacy of the use of force in a custodial setting. The factors include "(1) the need for the application of

force, (2) the relationship between need and the amount of forced used, (3) the extent of the prisoner's injuries, (4) the threat reasonably perceived by the officials on the basis of facts known to them, and (5) efforts made to tempter the severity of the force." *Tate v. Rockford*, 497 F. App'x 921, 923 (11th Cir. 2012) (citing *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007)). These factors determine whether "the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to knowing willingness that it occur." *Skrtich v. Thorton*, 280 F.3d 1295, 1299 (11th Cir. 2002) (quoting *Whitley*, 475 U.S. at 321).

In the case at hand, a genuine issue of material fact exists as to whether force was applied maliciously and sadistically by Defendant Fort to cause an unjustified infliction of harm. It is undisputed Plaintiff failed to follow prison officials' instructions to cuff up for his transfer from the recreational cage to his cell. Doc. 1, p. 13. Prison officials have great interest in maintaining order and safety in a prison, and may use reasonable force to achieve this interest. *Ort v. White*, 813 F.2d 318, 322 (11th Cir. 1987). A reasonable finder of fact could conclude, however, that Defendant Fort's use of force was not proportional to the need to obtain compliance and ensure officer and inmate safety.

Plaintiff was in a recreational cage outside of the J-2 dorm on November 19, 2013, while he awaited his transfer to his new cell, unarmed and alone. Plaintiff stated that he believed he was being harassed by Defendant Fort and asked to speak with Warden Barrow. *Id.* Plaintiff did not speak with Warden Barrow, and after a period of approximately thirty minutes, Plaintiff was asked to cuff up, under the usual prison policy for transferring prisoners. *Id.* Plaintiff refused to cuff up, and a CERT extraction team was assembled to remove Plaintiff from the recreational cage.

The initial force used by Defendant James against Plaintiff was not wanton or harmful. Once the CERT extraction team was at Plaintiff's recreational cage, Defendant James gave a final instruction for Plaintiff to cuff up. Doc. 1, p. 5; Doc. 33, Exh. 6 at 01:40. Plaintiff refused to comply with Defendant James' order, and Defendant James sprayed O-C spray at Plaintiff. Doc. 1, p. 5; Doc. 33, Exh. 6 at 01:43. After the administering of O-C spray, Officer Ruff began firing pepper balls at Plaintiff, firing seven (7) pepper-ball shots in a span of approximately forty seconds.[1] Doc. 33, Exh. 6 at 01:47-2:30. Defendant James' use of force was proportional to the interest of maintaining order in the prison, and her force was designed to obtain compliance with the reasonable instruction to cuff up. *See Ort*, 813 F.2d at 322.

After this initial use of force, Plaintiff began to pace back and forth in the recreational cage and yell profanities. Doc. 33, Exh. 6 at 02:14. Plaintiff escalated the situation by taking off his shirt, causing inmates within the dorm to yell, cheer, and bang on things as they observed Plaintiff's actions. Doc. 33, Exh. 6 at 2:33. To gain control of the situation, Defendant James administered a second wave of O-C spray and another officer shot additional pepper-balls at Plaintiff. Doc. 33, Exh. 6 at 02:31. The audio from the recording indicates that the pepper-ball gun was shot approximately five times during this second use of force.[2] Doc. 33, Exh. 6 at 02:27-2:49. Due to Plaintiff's continued refusal to comply with prison orders, and the agitation of the other inmates inside of the prison, this second use of force was also proportional to Defendants' interest in prison safety and order.

Following this second use of force, Plaintiff continued to pace and yell within the cage. Doc. 33, Exh. 6 at 02:49. Defendant Fort then took the pepper-ball gun from Officer Ruff, who

---

[1] Officer Ruff was is not a named Defendant in this case. Additionally, Plaintiff names Defendant Stewart as a pepper-ball shooter, but has since retracted that allegation and dismissed his claims against Defendant Stewart.
[2] It is unclear from the video as to who is firing these pepper-ball shots because, at this time, Officer Ruff had left the recreational cage due to being overcome by the chemicals in the air. Doc. 33, Exh. 6 at 02:27-2:49. The audio and visual clearly show that Plaintiff was being shot by a pepper-ball gun.

had been overwhelmed by the O-C spray, and approached the cage. *Id.* Defendant Fort began shooting Plaintiff with the pepper-ball gun, firing approximately two shots at Plaintiff. Doc. 33, Exh. 6 at 02:50. Once Plaintiff saw Defendant Fort was at the fence, Plaintiff approached Defendant Fort's position yelling, "there you go! I'ma come up! I'ma come up!" Doc. 33, Exh. 6 at 02:52. As Plaintiff approached, he covered his face with his hands, and Defendant Fort began rapidly shooting Plaintiff with the pepper-ball gun. *Id.* The rapid firing of the pepper-ball gun caused Plaintiff to let out a groan and walk backwards away from Defendant Fort. Doc. 33, Exh. 6 at 02:58. As Plaintiff retreated from Defendant Fort, Defendant Fort continued to shoot him with pepper balls, hitting him predominately in the stomach and chest. *Id.*

Once Plaintiff had retreated from Defendant Fort and was approximately twelve to eighteen feet away, Plaintiff dropped his hands from his face and the shooting momentarily ceased. Doc. 33, Exh. 6 at 03:01. During this pause, the video records Plaintiff saying, "you a coward, you a coward." Doc. 33, Exh. 6 at 03:02-03:05. Following these comments, Defendant Fort fired the pepper-ball gun again, hitting Plaintiff's face and head. Doc. 33, Exh. 6 at 03:05-03:13. The video shows at least four pepper-ball shots hitting Plaintiff directly in the face and head. Doc. 33, Exh. 6 at 03:05-03:11.

Plaintiff appeared to be in immediate pain after being shot in the face, and he began holding his face and yelling "my eye . . . oh shit." Doc. 33, Exh. 6 at 03:10. Plaintiff then began to move towards the front of the recreational cage, while Defendant Fort continued to shoot. Doc. 33, Exh. 6 at 03:09-03:13. Most of these shots appear to land on Plaintiff's back and shoulder. *Id.* Defendant Fort paused firing once Plaintiff reached the front of the cage, but two additional shots were fired while Plaintiff was at the front of the cage. Doc. 33, Exh. 6 at 03:16. The camera's view is blocked from recording what Plaintiff was doing to warrant these two

shots, but the video does show that these shots were fired at a close range. Doc. 33, Exh. 6 at 03:16.

Although Defendant James' use of force was proper to restore order and to gain Plaintiff's compliance to a prison instruction, the video evidence, viewed in the light most favorable to Plaintiff, could support a reasonable inference of wantonness in Defendant Fort's use of force. *See Campbell v. Sikes*, 169 F.3d 1353, 1375 (11th Cir. 1999). Defendant Fort fired a pepper-ball gun at Plaintiff almost forty times in a span of almost thirty seconds. Doc. 33, Exh. 6 at 02:50-03:20. In comparison, before Defendant Fort picked up the pepper-ball gun, approximately eleven pepper-balls were shot at Plaintiff in a span of one minute. Doc. 33, Exh. 6 at 1:49-2:50. A reasonable finder of fact could determine that Defendant Fort's use of force was disproportionate to the interest of obtaining compliance by an inmate who was alone and unarmed in a locked cage.

Defendants argue Plaintiff was shot in the eye as a result of "Plaintiff approaching the projector." Def.'s Br. 33-2, p. 10. The video illustrates otherwise. The video evidence could be viewed to show that the pepper-ball shots were deliberately aimed at Plaintiff's face in response to Plaintiff's taunts of "you a coward, you a coward." Doc. 33, Exh. 6 at 03:02-03:05. The facial shots also came after Plaintiff had retreated several feet away from Defendant Fort and removed his hands from his face. *Id.* A genuine issue of material fact exists as to whether Defendant Fort's shooting of Plaintiff's face was intended to obtain Plaintiff's compliance, or rather to punish Plaintiff for his actions. *See Ort*, 813 F.2d at 322.

Plaintiff's injuries were significant. In addition to multiple lacerations of the head, back, and abdomen, the medical records indicate that Plaintiff suffered possibly permanent injuries to his right eye. Plaintiff was later diagnosed with commotio retinae of the fovea, damage to the

outer retinal layers due caused by blunt trauma. Doc. 33-12, p. 35. Plaintiff's foveal pit also broadened and widened due to atrophy, or degeneration of the cells. *Id.* at 36. Dr. Falk of Dublin Eye Clinic stated that no visual rehabilitation was available for Plaintiff's impairments and recommended Plaintiff wear glasses full time. *Id.* at 34. Dr. Falk also recommended that Plaintiff have yearly eye exams to monitor the development of glaucoma in the next five years "due to trauma." *Id.*

Defendants argue that shooting Plaintiff in the eye was necessary to gain compliance and that the force applied was tempered once the necessity for force ended.  Def.'s Br. 33-2, p. 10. Defendants rely on Plaintiff's comment that being shot in the eye is the only thing that stopped him. *Id.* The video, however, shows Plaintiff retreating from Defendant Fort after being shot in the chest and stomach with the pepper-ball gun. Doc. 33, Exh. 6 at 03:02-03:05. As stated above, it was after this retreat away from Defendant Fort that Plaintiff was shot in the eye. *Id.* Defendant Fort also continued to shoot Plaintiff the entire time Plaintiff approached the front of the recreational cage to comply with the officers' instructions. Doc. 33, Exh. 6 at 3:09-3:13. Once Plaintiff was at the front of the cage, Defendant Fort shot Plaintiff an additional two times at close range. Doc. 33, Exh. 6 at 3:16. Defendant Fort's shooting of Plaintiff's eye creates a genuine issue of material fact as to whether this action was necessary to gain compliance with prison instructions, and whether the shooting was tempered once Plaintiff began to comply with Defendants' orders.

In sum, Defendants argue force was needed to gain Plaintiff's compliance with their orders and the force used was proportional to meet that need. Def.'s Br. 33-2, p. 8-11. Defendants also argue the extent of the injury was necessary to gain compliance and the severity of the force was tempered once the necessity for force ceased. *Id.* at 10. Defendant James applied

an amount of force proportional to meet the need to gain Plaintiff's compliance with her reasonable orders. There are genuine issues of material fact, however, regarding the nature of the force used by Defendant Fort, and whether Defendant Fort acted "maliciously and sadistically" to cause harm to Plaintiff. Although Defendant James is entitled to summary judgment on this issue, Defendant Fort is not.

**B.    Failure to Intervene Claim**

Defendants are entitled to summary judgment on Plaintiff's failure to intervene claim. Under the Eighth Amendment, "an officer who is present at the scene[,] and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008); *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007) (quoting *Skrtich v. Thornton*, 280 F.3d 1295, 1302 (11th Cir. 2002)) (quotation marks omitted). This liability arises for a defendant who "is in a position to intervene and fails to do so." *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 924–25 (11th Cir. 2000); s*ee Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998)("[F]or an officer to be liable for failing to stop police brutality, the officer must be in a position to intervene[.]").

The evidence is insufficient to create a genuine issue of material fact as to Plaintiff's claims that Defendants Grier, Oliphant, Askew, Gibbons, Danford, Conner, and Lockhart failed to intervene when they observed Defendant Fort use excessive force against Plaintiff. The video shows that Defendant Fort fired the pepper-ball gun at Plaintiff rapidly in a short period of time. Doc. 33, Exh. 6 at 02:50-03:20. During this time, all of the Defendants named above were in arm's length from Defendant Fort. *Id.* Although Defendants were in close proximity and position to intervene when Defendant Fort was firing, the events happened quickly during a period of

approximately thirty seconds. The most significant shots, to Plaintiff's face, occurred only at the end of that period. Because of the rapid progression of events, the other officers were not in a position to intervene once it arguable became apparent that the use of force had escalated beyond necessity. When the evidence is viewed in the light most favorable to Plaintiff, these Defendants are entitled to judgment as a matter of law.

## C.   Indifference to Serious Medical Need Claim

Plaintiff alleges that Defendant Fort deliberately denied him the opportunity to schedule and attend appointments with doctors and ophthalmologist. Doc. 1, p. 11. This claim is not supported by the evidence in the record. Plaintiff was given numerous opportunities to be seen by medical personnel and there is no evidence that Defendant Fort acted with deliberate indifference to Plaintiff's medical needs. Def.'s Br.'s 33-2, P. 12-14.

The Eighth Amendment prohibits cruel and unusual punishment, which includes deliberate indifference to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Nonetheless, not every claim of inadequate medical treatment states a cognizable claim under the federal constitution. *Id*. "Medical treatment violates the [E]ighth [A]mendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (citation omitted).

To establish deliberate indifference to medical needs, a prisoner must satisfy both an objective and a subjective component. *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000); *Campbell v. Sikes*, 169 F.3d 1353, 1363 (11th Cir. 1999). Regarding the objective component, a prisoner must show an "(1) an objectively serious medical need that, if left unattended, poses a substantial risk of serious harm, and (2) that the [defendants'] response to that need was poor

enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." *Bishop v. Pickens Cty. Jail*, 520 F. App'x 899, 900 (11th Cir. 2013); *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011); *Barnes v. Martin Cty. Sheriff's Dep't*, 326 F. App'x 533, 534 (11th Cir. 2009); *Nichols v. Burnside*, No. 5:11-CV-116, 2014 WL 657185, at *6 (M.D. Ga. Feb. 19, 2014). For example, in *Barnes*, the court held that the plaintiff failed to meet the second prong of the objective component because prison medical staff reasonably responded to the plaintiff's injury by examining the plaintiff numerous times and by prescribing the Plaintiff medications. *Barnes*, 326 F. App'x at 535.

Regarding the subjective component, a prisoner must establish three elements: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that is more than mere negligence. *Bingham*, 654 F.3d at 1176; *Barnes,* 356 F. App'x at 535; *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). A prison official's conduct is more than mere negligence where that conduct includes: "(1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all." *Barnes*, 326 F. App'x at 535; *Brown v. Johnson,* 387 F.3d 1344, 1351 (11th Cir. 2004). Deliberate indifference does not apply to an inmate who receives treatment, but desires a different mode of treatment. *Barnes*, 326 F. App'x at 535; *Hamm v. DeKalb County,* 774 F.2d 1567, 1575 (11th Cir. 1985). Additionally, as with any tort claim, the prisoner must show that some injury was caused by the defendant's wrongful conduct. *See Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995).

Viewed in the light most favorable to the Plaintiff, the evidence in this case is insufficient to satisfy the second prong of the objective standard. Defendant Fort's response to Plaintiff's

injury did not constitute a wanton infliction of pain. Directly following the incident on November 19, 2013, Plaintiff was given a shower for decontamination and was taken to the medical unit to be examined by the prison medical staff. Doc. 1, p. 6; Doc. 33, Exh. 6 at 04:54 and 5:48. The medical staff determined that Plaintiff needed immediate medical treatment, and Defendant Fort granted their recommendation to send Plaintiff to Oconee Regional Medical Center. Doc. 1, p. 7; Doc. 33, Exh. 6 at 7:01. The medical staff at the hospital allegedly stated that they could not determine the damage done due to the swelling of Plaintiff's eye and recommended that Plaintiff "[f]ollow up with an [o]phtha[l]mologist tomorrow." Doc. 33-12, pp. 20-21.

The following day, back at WSP, Plaintiff was examined by Dr. Rogers of the prison medical staff. Doc. 1, p. 7. Plaintiff alleges that during this visit he overheard Defendant Grier inform Dr. Rogers that "[Defendant] Fort did not want Plaintiff sent out of the prison for no reason until further notice from [Defendant Fort]." *Id.* Dr. Rogers did contact Dublin Eye Clinic regarding Plaintiff's conditions, although Plaintiff states that Dr. Rogers failed to inform the clinic that had been shot with a pepper-ball gun. *Id.* Plaintiff also states that Dr. Rogers failed to inform the clinic that Plaintiff had no vision in his right eye. *Id.* at 8. The Dublin Eye Clinic directed Dr. Rogers to give Plaintiff a topical treatment and artificial tears. *Id.*

Plaintiff was seen again by Dr. Rogers on November 26. Doc. 33-12, p. 26. Dr. Rogers noted that Plaintiff's injuries had improved and that the swelling and redness had decreased. *Id.* Dr. Rogers informed Plaintiff that his vision would recover and determined that he did not need to see an ophthalmologist. Plaintiff was also seen by a prison nurse on December 3, and the nurse made an appointment for Plaintiff to be seen again on December 6. *Id.* at 7.

Dr. Henderson and a nurse from the WSP medical staff saw Plaintiff on December 13,

2013. Doc. 1, p. 9. Dr. Henderson noted that Plaintiff had lost weight and complained of blurriness in his eyes. Doc. 33-12, p. 28.  Plaintiff alleges that Dr. Henderson told Plaintiff that "[Defendant] Fort refused transportation for Plaintiff's eye specialist appointments." Doc. 1, p. 9. Medical records show that on December 16, Plaintiff went to the Dublin Eye Clinic, but the doctor was on vacation. Doc. 33-12, p. 30. The medical records also show that Plaintiff was scheduled for another eye appointment on December 23, but Plaintiff was on lock down and unable to travel away from the prison. *Id.*

Plaintiff was finally taken to an ophthalmologist on February 3, 2014. Kathryn Falk, O.D., of Dublin Eye Clinic examined Plaintiff and noted an abnormal fovea pit, a vitreoretinal tuft, "difficult view peripherally due to resolving hemorrhage," and "scarring superior temporally." Doc. 33-12, pp. 33-34.  Her concluding impression was unspecified macular degeneration in the right eye, "very symptomatic, stable; due to trauma, possibly previous commotio retinae of the fovea," along with a vitreous hemorrhage. *Id.* at 34. Dr. Falk recommended that Plaintiff wear glasses full time and have a yearly eye exam to monitor the possible development of glaucoma. *Id.*

Plaintiff also saw a retina specialist at the Dublin Eye Clinic. The retina specialist noted "loss of inner/outer segment junctions on the OCT in the right eye with a broadening and widening of the foveal pit all consistent with atrophy probably secondary to commotion retina." *Id.* at 35. Examination of the right eye revealed significant hemorrhage, making it "very difficult to see through the streaks of blood," but no sign of a hole or tear. *Id.* The specialist recommended a follow-up exam in a month "to check on the hemorrhage and possibility of a detachment." *Id.*  Plaintiff was transferred out of WSP several days later.

The evidence, viewed in the light most favorable to Plaintiff, shows that Plaintiff suffered

an objectively serious medical need. The evidence is insufficient, however, to support the second prong of the objective component test, demonstrating that Defendant Fort's response to that medical need constituted an unnecessary and wanton infliction of pain. Plaintiff was examined by the medical staff at the prison on numerous occasions. Immediately following Plaintiff's injury, Defendant Fort allowed Plaintiff to be rinsed off, examined by prison medical personnel, and transferred to the local hospital. Doc. 1, p. 7. The prison medical staff also consulted the Dublin Eye Clinic regarding treatment options for Plaintiff, and referred Plaintiff to an ophthalmologist and a retina specialist. Doc. 1, p. 7. The record shows Plaintiff received numerous treatments for his injuries and that he was attended to by prison and private medical staff. Even if the medical care rendered was less than optimal, Defendant Fort's response to Plaintiff's injuries was not so indifferent as to constitute an unnecessary and wanton infliction of pain. *See Taylor*, 221 F.3d at 1258.

The evidence is also insufficient to meet the subjective component of the deliberate indifference analysis. Defendant Fort allowed Plaintiff to be examined by medical staff within the prison and outside the prison numerous times. Although Plaintiff alleges that Defendant Fort did not allow him to leave the prison to see an ophthalmologist, Plaintiff admits he was taken to the emergency room following his injury. Doc. 1, p. 7. Plaintiff additionally admits that prison medical staff consulted an ophthalmologist regarding their treatment of his eye, and that he was taken to see an ophthalmologist and eye specialist on February 3, 2014. *Id.* at 7 and 9. Defendant Fort's response to Plaintiff's injury does not indicate a disregard of the risk. Plaintiff has not established the second prong of the subjective component, and Defendant Fort is entitled to summary judgment on Plaintiff's indifference to serious medical needs claim.

**D.     Conditions of Confinement Claim**

Plaintiff alleges Defendant Fort violated his Eighth Amendment right by depriving him of food, water, and heat. Doc. 1, p. 11. Although the evidence is insufficient to support Plaintiff claims related to water and heat, there are genuine issues of material fact related to his claim that he was deprived of food.

Prisons are not mandated to be comfortable, and this Circuit has held "[i]nmates cannot expect the amenities, conveniences[,] and services of a good hotel." *Alfred v. Bryant*, 378 F. App'x 977, 980 (11th Cir. 2010). Prison officials, however, must provide adequate food, clothing, shelter, and medical care for their inmates. *Farmer*, 511 U.S. at 832-33. A prisoner may challenge the conditions of confinement by applying the above mentioned Eighth Amendment two-prong analysis: "an objective showing of a deprivation or injury that is 'sufficiently serious' to constitute a denial of the 'minimal civilized measure of life's necessities' and a subjective showing that the official had a 'sufficiently culpable state of mind.'" *Evans v. St. Lucie Cty. Jail*, 448 F. App'x 971, 973 (11th Cir. 2011); *Thomas v. Bryant*, 614 F.3d 1288, 1304 (11th Cir. 2010) (quoting *Farmer*, 511 U.S. at 834). The objective component of the two prong analysis requires extreme deprivations be present in the conditions of confinement, a challenge that is difficult to establish. *Evans*, 448 F. App'x at 973-74; *Thomas*, 614 F.3d at 1304. The subjective component requires "the official had a sufficiently culpable state of mind," more specifically, deliberate indifference. *Farmer*, 511 U.S. at 834; *Wilson*, 501 U.S. at 303. As discussed above, deliberate indifference is composed of three sub-components: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Evans*, 448 F. App'x at 974. Additionally, the prison official must have actual knowledge of the risk of harm: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting

*Farmer,* 511 U.S. at 837).

Plaintiff has not presented sufficient evidence to create a genuine issue of material fact, at prong one of the analysis, that there was a serious deprivation of water and heat in his cell. At his deposition, Plaintiff testified:

> "[t]he cell didn't have a sink. . . a teardrop of water wouldn't even come out. . . . I told [Defendant Fort] about the water numerous of times, about my property and about me not having no food and being able to shower. . . . [I didn't have food, water, or heat for] between nine days and – and thirteen days."

Doc. 33-6, p. 27-28. Besides his testimony, no evidence has been presented that show Plaintiff was deprived of water and heat. The numerous medical examinations of Plaintiff, over several weeks, do not report illnesses that result from being in cold conditions, nor do they mention dehydration symptoms. Plaintiff's door charts show that meals and showers were provided to Plaintiff on a consistent basis from November 19 to January 4. Doc. 33-5, pp. 4-5, 7-13. Additionally, Defendant Fort has provided testimony of a former lieutenant at WSP who states that each meal contained a beverage and that the J-dorm was served by a central heating system that was never turned off during the winter of 2013. Doc. 33-5, p. 5. Assuming Plaintiff was exposed to cold weather, the amount of exposure Plaintiff alleges does not amount to the level of objectively serious harm necessary to show an Eighth Amendment violation. *King v. Henry*, 2010 WL 4386539, at *7 (N.D. Fla. Sept. 24, 2010).[3]

Regarding the withholding of food in Plaintiff's conditions of confinement claim, Plaintiff has provided sufficient evidence to establish a genuine issue of material fact as to

---

[3] *See Helling v. McKinney,* 509 U.S. 25, 36 (1993); *see also Mays v. Springbor,* 575 F.3d 643, 648–49 (7th Cir. 2009) (prisoner's allegations of exposure to cold did not rise to level of objectively serious harm necessary to show Eighth Amendment violation where prisoner alleged he caught colds, suffered hurt ears and numb hands, and felt frostbite, but failed to show he was exposed to cold for long periods of time or that he suffered anything more than usual discomforts of winter).

whether food was provided to Plaintiff. At his deposition, Plaintiff testified that Defendant Fort withheld food from Plaintiff for a period of nine to thirteen days. Doc. 33-7, p. 22-24. Examining identical evidence explained above, the door chart shows Plaintiff was regularly given meals during the above time period, and until January 4. Doc. 33-5, p. 7-13. Defendant Fort argues during the alleged nine to thirteen days that "[Plaintiff] voice[d] no complaints to medical personnel about lack of food. . . [and] he lost zero pounds of body weight. . . ." Def.'s Br. 33-2, p. 19. The medical record supports Defendant's statement. Doc. 33-12, p. 7 (Nov. 20-265 lbs.), p. 27 (Dec. 3-265 lbs.).

Plaintiff lost sixteen pounds, however, over a span of ten days from December 3 to December 13. Doc. 33-12, p. 28. Dr. Henderson, in his medical records, noted Plaintiff's weight was 265 pounds on December 3, 2013, but was only 249 pounds on December 13, 2013. *Id.* In reference to the weight loss, the medical record includes a note stating, "I don't eat in the hole," but does not provide any other reasons or opinions as to the weight loss. *Id.* Although this weight loss occurred a few days after Plaintiff's alleged nine to thirteen day time period, the medical record clearly establishes the weight loss occurred. Dr. Rogers' Medical Progress record notes Plaintiff's weight was two hundred and forty-eight pounds more than a month later, on January 27, 2014. Doc. 33-12, p. 30. With this evidence of a drastic amount of weight loss and Plaintiff's testimony that he informed Defendant Fort he was not being fed, Plaintiff has established a genuine issue of fact that an objectively serious harm existed and that Defendant Fort was aware of the harm.

Regarding the subjective component of the analysis, Plaintiff has pointed to sufficient evidence that Defendant Fort withheld food with deliberate indifference to survive summary judgment. Plaintiff repeatedly informed Defendant Fort that Plaintiff was not receiving food

while he was in the cell J-2 192, yet Defendant Fort allegedly continued to instruct other officers not to give Plaintiff any food. Doc. 33-6, pp. 21, 23, 27-28. Defendant Fort allegedly told Plaintiff, "[y]ou're a tough guy. Tough guys don't write grievances." Doc. 1, p. 8; Doc. 33-6, p. 25. Plaintiff's loss of sixteen pounds within ten days was an obvious serious harm, and Plaintiff in his deposition testimony states that he informed Defendant Fort about the lack of food. Drawing all reasonable inferences in favor of Plaintiff, a reasonable finder of fact could find that Defendant Fort acted with deliberate indifference to Plaintiff's conditions of confinement.

## E.     Retaliation Claim

Plaintiff alleges Defendant Fort validated him as a gang member and withheld food, water, and heat, in retaliation for Plaintiff's filing grievances against him. Doc. 1, p. 11. Defendant Fort argues there is no causal connection between Plaintiff's grievances and Plaintiff's being validated as a gang member, and that basic necessities were not withheld from Plaintiff. Def.'s Br. 33-2, p. 16. Although the evidence is insufficient to support a retaliation claim regarding the validation as a gang member and the alleged withholding of water and heat, there are genuine issues of material fact related to the alleged withholding of food.

Prison officials are prohibited from retaliating against prisoners for exercising their right of free speech. *Smith v. Sec'y, Florida Dep't of Corr.*, 358 F. App'x 60, 62 (11th Cir. 2009); *Farrow v. West,* 320 F.3d 1235, 1248 (11th Cir. 2003). For a prisoner to state a retaliation claim, the prisoner must allege that: "(1) his speech or act was constitutionally protected, (2) the defendant's retaliatory conduct adversely affected the protected speech, and (3) there is a causal connection between the retaliatory actions and the adverse effect on speech." *Smith,* 358 F. App'x at 62; *Smith v. Mosley,* 532 F.3d 1270, 1276 (11th Cir. 2008). Examining each prong, first, a prisoner's grievance alleging a condition of confinement claim is protected speech under

the First Amendment. *Douglas v. Yates*, 535 F.3d 1316, 1321 (11th Cir. 2008). Under the second prong, whether the alleged retaliation would "adversely affect" the prisoner's protected speech is an "objective standard and a factual inquiry." *Smith*, 532 F.3d at 1277; *see Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999) (applying an objective inquiry to the determination if prison officials alleged retaliation was capable of deterring a person of ordinary firmness from exercising their protected rights).

The Eleventh Circuit has established that the third prong of this analysis is determined under a burden-shifting formula. *Smith,* 532 F.3d at 1278; *Smith v. Governor for Alabama*, 562 F. App'x 806, 815 (11th Cir. 2014). "[O]nce the plaintiff ... establish[es] that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he ... prevail[s] on ... summary judgment." *Smith v. Governor for Alabama*, 562 F. App'x 806, at 815.

In the case at hand, there is no evidence that there was a causal connection between Plaintiff's validation as a gang member and Plaintiff's grievances. Filing a grievance against a defendant's alleged excessive force is constitutionally protected speech. Additionally, validating someone as a member of a gang, while in prison, may objectively deter a person from exercising their protected rights. *See Wyatte v. Bryson*, No. 5:15-CV-92, 2016 WL 917327, at *6 (S.D. Ga. Mar. 8, 2016). The evidence does not support a causal connection, however, between Plaintiff's grievances and this validation as a gang member.

Evidence against Plaintiff being a member of a gang was gathered long before Plaintiff's grievances were filed, and long before Plaintiff ever encountered Defendant Fort. In 2009, Plaintiff was first validated as a member of the Black Panthers while at Georgia State Prison.

Doc. 33-4, p. 7. At Macon State Prison, on March 6, 2012, during his intake following a transfer from GSP, case notes record that Plaintiff admitted to being a "shot caller" with the GF gang and boasted that "with just one word he could turn this facility out."[4] Doc. 33-3, p. 12. While at Baldwin State Prison in April 2012, Plaintiff was validated as a member of Young Mafia Family, a branch of the Good Fellas. *Id.* at 13. While at WSP, Plaintiff was observed on October 17, 2013, only communicating with known GF members. *Id.* at 12. Additionally, on November 8, 2013, Plaintiff was again seen talking only with known GF members. *Id.* On November 14, 2013, Defendant Fort received an anonymous inmate letter informing Defendant Fort of Plaintiff's membership in GF and communicating fears of a confrontation between rival gangs. Doc. 33-3, p. 8. These incidents, along with the documents in Plaintiff's STG file, led to Defendant Fort assigning Plaintiff to the J-2 segregation unit on November 19, 2013. *Id.* at 14. A day after the November 19, 2013, incident, prison officials found a shirt in Plaintiff's room with a GF symbol on it. *Id.* That same day, WSP validated Plaintiff as a member of GF, and the Central Office approved this status change on November 22, 2013. *Id.* Plaintiff filed his first grievance on November 21, 2013, the day after he was validated as a GF member. Doc. 37, exh. 7. The timing of Plaintiff's validation as a GF member does not support a causal link between Plaintiff's grievances and his validation.

Plaintiff argues that a January 30, 2015, determination by the Central Office Appeal Response demonstrates Plaintiff was not affiliated with GF. Doc. 37-11, p. 2. This determination, however, was made a year and a half after Plaintiff was validated as a GF. This determination was also made at a different prison. Additionally, evidence supports Plaintiff's 2013 validation as a member of GF, regardless of Plaintiff's grievances.

---

[4] The case notes indicate that Plaintiff was found to have concealed a cell phone and cell phone charger in his rectum during a search incident to his intake at Macon State Prison.

Following the same three step analysis, there is no evidence to establish that Plaintiff suffered any adverse action by way of water and heat being withheld. These claims fail at step two of the analysis because Plaintiff has failed to present sufficient evidence that he was deprived of water and heat. Plaintiff has, however, established an objective adverse action at step two by presenting evidence of a genuine issue of material fact regarding the withholding of food. The withholding of food, causing Plaintiff to rapidly lose sixteen pounds, would deter an ordinary person from filing a grievance. Additionally, this adverse action creates an issue of material fact as to whether there was a causal connection between the grievances and the withholding of food. The evidence is sufficient to establish a genuine issue of material fact as to Plaintiff's retaliation claim regarding the withholding of food. Plaintiff's retaliation claims regarding the validation as a gang member and the withholding of water and heat are entitled to summary judgment.

## F.      Qualified Immunity Defense

Defendants argue Plaintiff's claims shall fail because they are entitled to summary judgment based on qualified immunity. Qualified immunity protects government officials from personal liability if their conduct violates no "clearly established statutory or constitutional rights of which a reasonable person would have known. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014); *Gonzalez v. Reno,* 325 F.3d 1228, 1233 (11th Cir. 2003). A public official must first establish that he was acting within his discretionary authority to receive qualified immunity. *Caldwell*, 748 F.3d at 1099; *Terrell v. Smith,* 668 F.3d 1244, 1250 (11th Cir. 2012). Once the public official has met this burden, the plaintiff must meet a two-part test: "(1) the defendants violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Caldwell,* 748 F.3d at 1099; *see Pearson v. Callahan,* 555 U.S. 223,

236 (2009). This inquiry is "undertaken in light of the specific context of the case, not as a broad general proposition." *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir. 2002).

It is undisputed Defendants were acting within their discretionary authority when they gave orders for Plaintiff to cuff up and used force against Plaintiff to gain compliance. As discussed above, there is a genuine issue of material fact as to whether Defendant Fort violated Plaintiff's Eighth Amendment right by using excessive force on Plaintiff in the November 19, 2013, incident. The facts, viewed in the light most favorable to Plaintiff, show Plaintiff was shot numerous times by the pepper-ball gun, several times in the face. A genuine issue of material fact exists as to whether several of the shots were fired to inflict pain, not gain compliance. *Skrtich v. Thornton*, 280 F.3d 1295, 1304 (11th Cir. 2002); *see Whitley,* 475 U.S. at 320–21. It is clearly established law that force used to inflict pain is excessive and that qualified immunity will not shield the defendants who administer such force. *Skritch*, 280 F.3d at 1305; *Whitley*, 475 U.S. at 320–21. Defendant Fort is not entitled to qualified immunity for his alleged administration of excessive force. Defendants Grier, Oliphant, Askew, Danford, Conner, and Lockhart are entitled to qualified immunity on the failure to intervene claims, because there is insufficient evidence to indicate that they had an opportunity to intervene.

Defendant Fort also argues he is entitled qualified immunity regarding Plaintiff's deliberate indifference claim to serious medical need claim. Because Defendant Fort's response to Plaintiff's injury was reasonable and not deliberately indifferent, Defendant Fort did not violate Plaintiff's Eighth Amendment. Defendant Fort is entitled to qualified immunity regarding Plaintiff's indifference to serious medical need claim.

Similarly, Defendant Fort contends he is entitled to qualified immunity regarding Plaintiff's conditions of confinement claims. There are genuine issues of material fact as to

whether food was actually withheld, and it is clearly established that the withholding of food is a violation of the Eighth Amendment. *See Brown v. Thompson*, 868 F. Supp. 326, 330 (S.D. Ga. 1994). Defendant Fort, therefore, is not entitled to qualified immunity regarding his alleged withholding of Plaintiff's food. Because there is no substantial evidence that Defendant Fort withheld water and heat, he is entitled to qualified immunity on those claims.

**G.     Eleventh Amendment Immunity**

Defendants argue that Plaintiff's claims against Defendants in their official capacities are barred by the Eleventh Amendment. The Eleventh Amendment bars actions against a State and State Officials sued in their official capacities in federal court. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *Cory v. White,* 457 U.S. 85, 90 (1982). A state and its state officials may be sued in two exceptions, (1) where the state has consented to suit or waived its immunity, or (2) where Congress has overridden the state's immunity. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 98–100 (1984). The Eleventh Amendment, however, does not provide protection for state employees who are sued in their individual capacity for their own "employment-related acts." *Scheuer v. Rhodes,* 416 U.S. 232, 238 (1974); *Jackson v. Georgia Dep't of Transp.,* 16 F.3d 1573, 1575 (11th Cir. 1994). When it is unclear which capacity the defendants are sued under, "the course of proceedings typically indicates the nature of the liability sought to be imposed." *Jackson*, 16 F.3d at 1575; *Hobbs v. Roberts,* 999 F.2d 1526, 1527 (11th Cir. 1993). "The general test for determining whether the state is the real party in interest, even though it is not a named defendant, is whether the relief sought against the nominal defendant would in fact operate against the state. . . ." *Jackson*, 16 F.3d at 1575; *see Edelman v. Jordan,* 415 U.S. 651, 663, (1974). Additionally, this Circuit has established that "Eleventh Amendment immunity applies only if the judgment must, under all circumstances, be paid out of

state funds." *Jackson*, 16 F.3d at 1575; *Travelers Indem. Co. v. School Bd.,* 666 F.2d 505, 509 (11th Cir.), *cert. denied,* 459 U.S. 834 (1982).

Plaintiff's complaint seeks damages against Defendants in their Official and Individual Capacities. Doc. 1. The Eleventh Amendment bars Plaintiff's official capacity claims against Defendants. Plaintiff's individual capacity claims, however, are not barred by the Eleventh Amendment. *Hobbs v. Roberts*, 999 F.2d 1526, 1530 (11th Cir. 1993) (holding "[t]o repeat the obvious, people can be liable in their individual capacities for acts performed in state employment, that is, as state agents.")

## H.    Physical Injury Under the PLRA

Defendant argues Plaintiff is only able to recover nominal damages for his claims of deliberate indifference to serious medical need, conditions of confinement, and retaliation because Plaintiff did not allege any physical injury. Plaintiff, in his Complaint and Response to Defendants' Motion for Summary Judgment, has alleged physical injury and violations of his constitutional rights. Doc. 1, pp. 12-13; Doc. 37, pp. 6-7.

Plaintiff's claims are governed by the Prison Litigation Reform Act ("PLRA"), specifically section 42 U.S.C. § 1997e(e). This section provides that:

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act....

42 U.S.C. § 1997e(e). It is well established that this section of the PLRA applies to all federal civil actions, including claims brought under § 1983. *Brooks v. Warden*, 800 F.3d 1295, 1307 (11th Cir. 2015); s*ee Harris v. Garner (Harris II),* 216 F.3d 970, 984–85 (11th Cir. 2000) (en banc).

A prisoner can recover punitive and compensatory damages for constitutional violations if the prisoner can demonstrate a physical injury. *Brooks*, 800 F.3d at 1307; s*ee Al–Amin v. Smith,* 637 F.3d 1192, 1198 (11th Cir. 2011). A prisoner may recover nominal damages for constitutional violations where he cannot demonstrate a physical injury. *Brooks*, 800 F.3d at 1307; *Magwood v. Sec'y, Florida Dep't of Corr.*, No. 15-10854, 2016 WL 3268699, at *3 (11th Cir. June 15, 2016). If a prisoner has not sought nominal damages, because of the liberal construction awarded to *pro se* pleadings, claims for nominal damages will be considered. *See Hughes v. Lott*, 350 F.3d 1157, 1162–63 (11th Cir. 2003).

There are genuine issues of material fact as to Plaintiff's conditions of confinement and retaliation claims to support a finding of physical injury. Plaintiff has claimed his Eighth Amendment rights were violated and that he suffered injury because Defendant Fort withheld food from him. Doc. 1, pp. 12-13; Doc. 37, pp. 6-7. Plaintiff, specifically, has sought compensatory, punitive, and nominal damages for his claims. Doc. 1, p. 12. Medical records provide evidence of an injury, showing that Plaintiff lost sixteen pounds in less than two weeks. Doc. 33-12, p. 28. Because there is a genuine issue of material fact as to whether Defendant Fort withheld food from Plaintiff, causing Plaintiff to suffer an injury, the PLRA does not bar Plaintiff's compensatory and punitive claims for these specific claims. In contrast, because there was no constitutional violation or injury caused by Defendant Fort's alleged deliberate indifference to serious medical needs, this claim is barred by the PLRA.

## CONCLUSION

For the reasons set forth above, it is **RECOMMENDED** that Defendants' Motion for Summary Judgment (Doc. 33) be **GRANTED IN PART** and **DENIED IN PART.**

It is recommended that Summary Judgment be **DENIED** as to Plaintiff's claims against

Defendant Fort for excessive force, deprivation of food, and retaliation by depriving Plaintiff of food.

It is further recommended that Summary Judgment be **GRANTED** as to all other claims, including claims against Defendants Grier, Oliphant, Askew, Gibbons, Danford, Conner, and Lockhart for failure to intervene, and claims against Defendant Fort for deliberate indifference to serious medical needs, deprivation of water and heat, and retaliation by deprivation of water and heat.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this Recommendation, or seek an extension of time to file objections, **WITHIN FOURTEEN (14) DAYS** after being served with a copy thereof. The District Judge shall make a de novo determination of those portions of the Recommendation to which objection is made. All other portions of the Recommendation may be reviewed for clear error.

The parties are further notified that, pursuant to Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."

**SO RECOMMENDED**, the 4th day of November, 2016.

s/ Charles H. Weigle
Charles H. Weigle
United States Magistrate Judge